IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 26, 2022 Session

**STATE OF TENNESSEE v. CONNER LEWIS BELL**

**Appeal from the Criminal Court for Hamilton County**
**No. 307910   Barry A. Steelman, Judge**

_____

**No. E2021-01120-CCA-R3-CD**

_____

Defendant, Conner Lewis Bell, was indicted by the Hamilton County Grand Jury for one count of attempted first degree murder, one count of aggravated assault, and one count of aggravated robbery. Defendant pleaded guilty to the lesser-included offense of reckless aggravated assault, and the remaining counts were dismissed. Pursuant to the plea agreement, Defendant received a sentence of three years as a Range I offender to be suspended on probation. Defendant requested judicial diversion, which the trial court denied following a hearing. Based upon the oral arguments, the record, and the parties' briefs, we affirm the trial court's denial of diversion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Ann C. Short and Donald A. Bosch, Knoxville, Tennessee, (on appeal); Bryan H. Hoss, Chattanooga, Tennessee (at diversion hearing), for the appellant, Conner Lewis Bell.

Herbert H. Slatery III, Attorney General and Reporter; Garrett Ward and Kayleigh Butterfield, Assistant Attorney Generals; Neal Pinkston, District Attorney General; and P. Andrew Coyle, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

At Defendant's guilty plea submission hearing, the State submitted that on January 8, 2019, Officer Corey Stokes of the Chattanooga Police Department was dispatched to the

scene of a pedestrian having been struck by a vehicle. When Officer Stokes arrived, he found that Defendant's wife had been struck by a vehicle and the victim, Jeffrie Chambers, had been shot multiple times. Officers learned that Defendant and his wife "were having some car trouble" and Defendant "flagged down the victim" to jumpstart his car. The victim helped Defendant jumpstart his vehicle, and then Defendant shot the victim twice in the arm. The victim stated he "was unsure [ ] why" Defendant shot him. The victim tried to grab the gun from Defendant, and the gun fired again. Defendant then "ran from the scene in the victim's vehicle, returned to the scene[,] and actually wrecked into his own vehicle, which injured his wife and actually led to his wife almost losing her leg, and she was hospitalized for some period of time."

Defendant was interviewed by police and asserted that he acted in self-defense, stating that he believed that he was being threatened by the victim[.]" The prosecutor told the trial court, "I do believe that a jury would be swayed by [the defense], which is the reason for the reduction in sentence." Defendant affirmed that he understood the charges against him, that his trial counsel reviewed the plea agreement with him and that he understood the rights he was waiving by pleading guilty. The trial court accepted Defendant's guilty plea to reckless aggravated assault.

At a hearing on Defendant's request for judicial diversion, the victim, Jeffrie Chambers, testified that he was driving home from work between 7:00 and 8:00 p.m. on January 8, 2019, when Defendant "flagged [him] down and asked [him] for a boost." Mr. Chambers testified, "I interact with people every day all day, so I was like, 'Sure.'" Mr. Chambers had never met Defendant. They were in a residential area, but Mr. Chambers did not know that Defendant was parked in front of Defendant's home. Mr. Chambers pulled his truck up to Defendant's car and used jumper cables to jumpstart Defendant's car.

Mr. Chambers stated that Defendant "was a nice guy" and they spoke while Defendant's battery was charging, which took less than five minutes. Mr. Chambers unhooked the cables from the two vehicles and reached up to close the hood on his truck. He testified, "as soon as I turned around, [Defendant] started shooting." Mr. Chambers grabbed for the gun, and they "just started tussling." Defendant then shot Mr. Chambers two more times. Mr. Chambers pleaded with Defendant to stop shooting, telling him that he had kids. The two men continued struggling, and Defendant shot Mr. Chambers in the forearm. Mr. Chambers pushed Defendant away and ran down the street to a nearby house where he asked the residents for help. Mr. Chambers then heard his truck engine. He testified, "I hear my truck, like, skid off, and that's when [Defendant] went around the corner and then hit somebody." Mr. Chambers sustained two gunshot wounds to his hand, one to his forearm, one to his head behind his ear, and one to his shoulder. After undergoing three surgeries to his hand, he had permanent injuries which interfered with his

ability to work. Mr. Chambers denied that he saw Defendant's gun and "lunged" for it. He testified that he did not know Defendant had a gun until he turned around and Defendant shot him.

Defendant's father, David Bell, testified that Defendant was raised in Columbia, Tennessee, and he attended Spring Hill High School, where he received good grades and graduated with honors in 2014. At the time of the incident, Defendant had just started his final semester at the University of Tennessee, Chattanooga, ("UTC") where he studied finance. Mr. Bell testified that Defendant had never exhibited behavioral problems and that he was "a great young man." Mr. Bell and Defendant's mother had been married for almost 30 years. Defendant "grew up in a very stable home and went to church regularly[.]" Defendant married his wife in 2016, and they had three children. As a result of the shooting, Defendant was suspended from UTC and fired from his job at Regions Bank. Since the incident, Defendant obtained his degree from Western Governors University and found new employment.

The gun Defendant used to shoot the victim was a .22 Ruger that had belonged to his great-grandfather. Mr. Bell testified that Defendant and his wife lived in an historic part of Chattanooga at the time of the incident. He testified, "[t]here had been some issues in the neighborhood [ ] that made [Defendant]'s family feel unsafe[.]" Defendant told his father that he had the gun outside because he had been doing yard work and felt unsafe in the neighborhood. Defendant said that Mr. Chambers saw the gun, "a fight ensued, and [Defendant] felt threatened." After Mr. Chambers ran for help, Defendant "panicked" and drove away in Mr. Chambers' truck. He immediately returned, "and he lost control of the truck and hit . . . the back of [his wife's] car and she was there." Defendant admitted to Mr. Bell that he lied to police and told them that Mr. Chambers was driving the truck when Defendant's wife was struck. Mr. Bell testified that Defendant had no criminal history, no history of mental health issues, and no history of substance abuse. Defendant sought counselling after the incident.

Defendant's wife, Chesney Bell, testified that she met Defendant while they were students at UTC. They were married in 2016. They had three children together. She testified that her memory of the events of January 8, 2019, were "very blurry" because the pain medication she received for her injuries "knocked a lot of [her] memory out of it." Ms. Bell's injuries included a broken femur, two broken hips, "a little bit of internal damage," and she received skin grafts. Ms. Bell underwent seven surgeries for her injuries. As a result of the incident, Ms. Bell had to close her at-home daycare business. Ms. Bell testified that this event had been "the biggest nightmare" for her family, including her physical recovery, their job losses, and damage to their reputations. She testified that Defendant was not an aggressive person. She and Defendant had both attended counselling

since the incident, and Defendant completed his college education and found new employment "to provide for his family[.]"

Defendant's testimony regarding his background was substantially similar to his father's testimony. Regarding the day of the incident, Defendant testified that he had planned to pressure wash his driveway. Because there had been a recent shooting in the neighborhood, Defendant retrieved his .22 caliber Ruger from inside his house and placed it on the passenger seat of his vehicle. Defendant testified that the gun was loaded with a round in the chamber and the safety was engaged. Defendant then raked leaves from the driveway. When he tried to move his vehicle, he discovered that the car battery was dead. Defendant knocked on two neighbors' doors, but they were not home. He became "impatient" and "stood out in the street trying to flag someone to help [him]." Mr. Chambers stopped and pulled his truck into the driveway facing Defendant's car. Defendant and Mr. Chambers "talked about the neighborhood," and Mr. Chambers "complimented" Defendant on the work he had done to his house. Mr. Chambers told Defendant that he worked on cars and gave him his cellphone number. Defendant testified that he and Mr. Chambers both had "pleasant" demeanors and they "got along fairly well."

Defendant testified about the shooting:

> [S]o after we stopped charging the car, Mr. Chambers was taking the cords off my car first, closed the hoods. And at this point, I had grabbed the pistol in my left hand, because I was going to go inside and put it up. Don't leave it out in my car. Don't want it to get stolen.
>
> At this point, Mr. Chambers, he was – he'd already put down my hood. He was pulling down the hood on his truck, and he turned around and saw the gun and he lunged. He grabbed ahold of the gun. I fired. I felt threatened. We fell to the ground. We fought. I ended up firing more. A struggle ensued.

Defendant testified that he "was blindly shooting" at Mr. Chambers during the struggle. Mr. Chambers then "ran off." Defendant dropped the gun and felt like he "had to get away." Mr. Chambers' truck engine was running, and the truck was blocking his car in the driveway. Defendant testified that he "was having a panic attack" and he drove Mr. Chambers' truck around the block before he "had a moment of clarity" and realized he had "to go back and fix this." When he arrived back at his house, he lost control of the truck and struck his wife. Defendant admitted that he lied to police when he told them that Mr. Chambers was driving the truck that struck Ms. Bell. Defendant testified that he was "in shock" and that he "didn't want to be held responsible for it, so [he] blamed Mr. Chambers, and that was wrong." When asked on cross-examination whether Defendant considered

- 4 -

waiting to retrieve the gun until after Mr. Chambers, a stranger, had left, Defendant responded, "I did not. I was naive." Defendant acknowledged that it "was a poor decision." When asked why Defendant thought Mr. Chambers "attacked" him, Defendant testified, "He thought that I was trying to do some harm to him. He lunged for [the gun]. His weight caused me to fall, to stumble, so we fell backwards onto the pavement."

After reading an "apology letter" that he wrote to the victim, Defendant presented "letters in support" from his family and friends. A presentence report was admitted into evidence. The report contained a risk and needs assessment, which concluded that Defendant had a low risk of reoffending. Prior to the judicial diversion hearing, Defendant had paid full restitution to Mr. Chambers for the damage to his truck.

### *Trial Court's Order Denying Diversion*

In a written order, the trial court denied Defendant's request for judicial diversion. The trial court considered Defendant's amenability to correction and found that the results of the risk and needs assessment, Defendant's payment of restitution, his letter expressing remorse, his decision to seek counselling after the incident, and his completion of college and continued employment weighed in favor of diversion. The court found, however, that Defendant's credibility was questionable and that Defendant's "insistence on the accuracy of his version of the pre-shooting events may reflect an unwillingness to fully accept responsibility for his actions," which negatively impacted Defendant's amenability to correction and "mitigate[ed] the previously mentioned facts found to be favorable to [d]iversion."

The court noted that, other than a speeding ticket, Defendant did not have a criminal record. The court considered Defendant's lack of a criminal record, his education, employment history, marriage, and social history and weighed those factors in favor of diversion. Considering Defendant's physical and mental health, the court noted Defendant's testimony that he suffered a panic attack during the incident and found that it "provide[d] some explanation" for Defendant's behavior. The court concluded, however, that "the extreme nature of [Defendant's] behavior . . . reflect[ed] a condition that can be dangerous to both others and the Defendant and as such does not weigh in favor of [d]iversion."

Considering the need for deterrence, the trial court found that no evidence had been offered regarding "how the granting or denial of [d]iversion would impact the community at large." The court noted, however, that the victim was acting as a "good Samaritan" and "public policy encourages such behavior and those who offer assistance to others should

be protected." The court also noted that Defendant's held a position of public trust through his employment.

In considering the interests of Defendant and the public, the trial court stated that it had "devoted much consideration to the impact of a felony conviction on the Defendant's future employment opportunities[,]" noting that Defendant had had "an excellent employment history[.]" The court also noted the negative impact Defendant's actions had on the victim's future employment opportunities in that his injuries affected his ability to perform the work he had always done. The trial court did not give weight to these factors or state how they impacted its decision to deny diversion.

The trial court found the circumstances of the offense to be "strange" and "the degree of recklessness exhibited by the Defendant and the resulting consequences to be extraordinary." The court stated:

> The circumstances of the offense involving extreme recklessness exhibited by the Defendant, life threatening violence and other uncharged criminal acts, resulting consequences of serious physical injury to two people and dishonesty toward an investigating law enforcement agency, jeopardizing the liberty of Mr. Chambers, outweigh the other [d]iversion factors and necessitate the memorialization of these events via a criminal conviction.

Defendant timely appeals the trial court's denial of judicial diversion.

### *Analysis*

Defendant contends that the trial court abused its discretion by denying judicial diversion. Defendant asserts that his "conduct on January 8, 2019, was a total aberration from his otherwise peaceful, law-abiding lifestyle"; that the trial court failed to properly weigh and consider the applicable factors; and that the trial court "improperly based its decision on a perceived need for potential future employers to know that [Defendant] has a criminal conviction." The State responds that the trial court properly denied Defendant's request for diversion.

Upon a finding of guilt, the trial court may defer further proceedings and place a qualified defendant on probation without entering a judgment of conviction. T.C.A. § 40-35-313(a)(1)(A) (2020). Once a defendant who is placed on diversion successfully completes probation, the charge will be dismissed. T.C.A. § 40-35-313(a)(2) (2020). A "qualified defendant" is a defendant who is found guilty or pleads guilty or nolo contendere

to a Class C, D, or E felony; is not seeking deferral for an offense committed by an elected official; is not seeking deferral for a sexual offense; has not been convicted of a felony or a Class A misdemeanor previously and served a sentence of confinement; and has not been granted judicial diversion or pretrial diversion previously. T.C.A. § 40-35-313(a)(1)(B)(i) (2020). The decision whether to grant judicial diversion is left to the trial court's discretion. *State v. King*, 432 S.W.3d 316, 323 (Tenn. 2014). The defendant bears the burden of proving that he or she is a suitable candidate for judicial diversion. *State v. Faith Renea Irwin Gibson*, No. E2007-01990-CCA-R3-CD, 2009 WL 1034770, at *4 (Tenn. Crim. App. Apr. 17, 2009) (citing *State v. Curry*, 988 S.W.2d 153, 157 (Tenn. 1999), *no perm. app. filed*; *State v. Baxter*, 868 S.W.2d 679, 681 (Tenn. Crim. App. 1993)).

In determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the interest of the public as well as the defendant. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). The circumstances of an offense alone may support a denial of judicial diversion. *State v. Kyte*, 874 S.W.2d 631, 634 (Tenn. Crim. App. 1993). Where the circumstances of the offense are "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree," and outweigh the other diversion factors, the trial court may base its denial on this factor alone. *State v. Trotter*, 201 S.W.3d 651, 654-55 (Tenn. 2006).

We review a trial court's decision regarding judicial diversion under the same standard set forth in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). *King*, 432 S.W.3d at 324. If the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasoning for granting or denying judicial diversion, then "the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id*. at 327. The trial court need not recite all the *Parker* and *Electroplating* factors when justifying its decision on the record in order to be granted a presumption of reasonableness. *Id*. However, the record should reflect that the trial court considered the factors when rendering its decision and that it identified the relevant factors applicable to the case. *Id*. Once the trial court identifies the relevant factors, it may proceed solely on those. *Id*.

Here, the trial court clearly considered the *Parker* and *Electroplating* factors, identified the relevant factors it applied to support its decision to deny Defendant's request

for judicial diversion, and expressly explained its reasoning. Thus, the trial court's decision is entitled to a presumption of reasonableness.

After considering all of the relevant factors, the trial court assigned great weight to the circumstances of the offense, noting the "extreme recklessness exhibited by the Defendant" and the "extraordinary" consequences that resulted from his actions. The trial court weighed Defendant's lack of a criminal history and his social history in favor of diversion. Although the court did not expressly state whether Defendant's amenability to correction, the need for deterrence, or the interests of the public and Defendant weighed in favor or against diversion, the court considered these factors and made factual findings relevant to the factors. For instance, the trial court found that Defendant's "insistence on the accuracy of his version of the pre-shooting events" indicating that Defendant had not taken full responsibility for his actions, which could negatively impact his amenability to correction. Regarding deterrence, the trial court noted that the victim was acting as a "good Samaritan" and concluded that "those who offer assistance to others should be protected."

Defendant takes issue with the trial court's determination that Defendant's future employers should be able to make "an informed decision" about whether to employ or promote Defendant in considering the interests of Defendant and the public. Defendant also argues that the record does not support the trial court's finding that Defendant's mental and physical health weighed against diversion. The trial court cited Defendant's explanation for his behavior that he had suffered a panic attack when he stole Mr. Chambers' truck and fled the scene. Regardless of whether the trial court's reliance on those factors was misplaced, the court explicitly found that the "extreme recklessness" of Defendant's actions outweighed the other applicable factors, concluding that the circumstances of the offense weighed heavily against the grant of diversion.

The evidence showed that Defendant flagged down Mr. Chambers who then, acting as a "good Samaritan", stopped to help Defendant jumpstart his car. Armed with a weapon, Defendant shot "blindly" at Mr. Chambers, causing four gunshot wounds and permanent injuries. As Mr. Chambers ran away, Defendant stole Mr. Chambers' truck, drove around the block and sped back to his house, where he lost control of the vehicle and struck his wife, causing her severe injuries. Defendant then lied to police about the incident, telling them that Mr. Chambers was driving the truck and struck Ms. Bell. Although Defendant expressed remorse, the evidence supports the trial court's conclusion that the circumstances of the offense were "shocking" and Defendant's behavior was extreme and especially reckless.

Upon review, we conclude that there is substantial evidence in the record to support the trial court's denial of judicial diversion. The trial court did not abuse its discretion. Defendant is not entitled to relief.

CONCLUSION

Based on the foregoing reasons, we affirm the judgment of the trial court.

_____

TIMOTHY L. EASTER, JUDGE